**Mary Alys MAUL, Appellant–Plaintiff,**

v.

**Gretchen VAN KEPPEL, Appellee–Defendant.**

No. 37A03–9811–CV–468.

Court of Appeals of Indiana.

July 23, 1999.

Robert L. Browning, Scopelitis, Garvin, Light & Hanson, Indianapolis, for appellant.

R. Brian Woodward, R. Brian Woodward & Associates, Merrillville, for appellee.

## OPINION

KIRSCH, Judge

Mary Alys Maul, a shareholder in a closely-held, family-owned corporation, appeals the trial court's denial of her summary judgment motion and the grant of summary judgment in favor of her sister and fellow shareholder Gretchen Van Keppel. Maul raises two issues:

I. Whether Van Keppel had a fiduciary duty to disclose the availability for purchase of certain shares of stock in the corporation;

II. If a fiduciary duty existed, whether Van Keppel breached that duty by purchasing the available shares without informing Maul.

We affirm.

## FACTS AND PROCEDURAL HISTORY

Albertena Sprague owned a farm in Jasper County. In 1975, she incorporated the farm by deeding the farm real estate to a newly formed corporation in return for all of the corporate stock. She became a director of

the corporation, along with two of her daughters, Mary Alys Maul and Gretchen Van Keppel. Maul and Van Keppel owned no shares of the corporation until Albertena gave them shares as gifts. Albertena periodically made such gifts, always giving equal numbers of shares to Maul, Van Keppel, and two other daughters. When Albertena died in 1992, her estate distributed the remaining shares to the four daughters equally so that each daughter held twenty-five percent of the corporate shares.

Shortly after Albertena died, the four sisters passed a resolution making each sister a corporate officer. They also passed resolutions stating that all sisters should be consulted on farm expenditures exceeding $1,000 and that upon the death of a sister her shares would be divided equally among her children. They later amended the second resolution to state that children who inherited shares would have one vote per family.

In 1997, Van Keppel bought out two of her sisters' interests in the corporation. Van Keppel did not tell Maul that the shares were available for purchase, nor did she tell Maul of her intent to become the majority shareholder. After purchasing the shares, Van Keppel removed Maul and the other sisters as directors and officers. Van Keppel also revoked the corporate resolutions concerning consultation on expenditures and concerning the distribution of shares after death.

Maul sued Van Keppel, alleging that Van Keppel had fiduciary duties to disclose the availability of the shares and to ensure that shareholding remained equal. Van Keppel denied that such duties existed. Both parties sought summary judgment. The trial court granted Van Keppel's summary judgment motion and denied Maul's motion. Maul now appeals.

## DISCUSSION AND DECISION

### I. Standard of Review

Both parties agree that the issue in this case is whether the sisters intended that there be equal ownership of the farm corpo-

ration. When the issue in a case involves intent, traditional doctrine counsels against granting summary judgment. *Century Bldg. Partnership v. SerVaas*, 697 N.E.2d 971, 973 (Ind.Ct.App.1998)("summary judgment must be denied if the resolution thereof hinges upon a state of mind, credibility of witnesses, or weight of testimony"). When the material designated by the parties is conclusive, however, summary judgment may be appropriate even if the dispositive issue turns on the parties' intent. *See Funk v. Funk*, 563 N.E.2d 127, 132 (Ind.Ct.App.1990), *trans. denied* (summary judgment granted on intent issue); *see generally Jarboe v. Landmark Comm. Newspapers, Inc.*, 644 N.E.2d 118, 123 (Ind.1994).[1]

In *Funk*, the issue was whether a testator intended to devise real property to his children. The trial court granted summary judgment in favor of the children, holding that they had met their burden of demonstrating the lack of any factual issue concerning the testator's intent. This court affirmed, noting that the Record was "obvious" that the testator intended to devise the property to the children. 563 N.E.2d at 131.

Here, as in *Funk*, we examine the Record to determine whether the parties' intent concerning equality of ownership is obvious. To make this determination, we apply the same standard as the trial court. *Wickey v. Sparks*, 642 N.E.2d 262, 265 (Ind.Ct.App. 1994), *trans. denied.* We examine the designated evidentiary matter and determine whether there exists any genuine issue of material fact. Ind. Trial Rule 56(C). If the designated evidentiary matter proves the parties' intent without question, summary judgment is appropriate. *See Sizemore v. Arnold*, 647 N.E.2d 697, 698 (Ind.Ct.App. 1995).

### II. Scope of Fiduciary Duty

As both parties point out, this case requires an application of the holding issued in *Cressy v. Shannon Continental Corp.*, 177 Ind.App. 224, 378 N.E.2d 941 (1978). Maul contends that the *Cressy* decision controls

---

1. In *Jarboe*, the court stated, "Under Indiana's standard, the party seeking summary judgment must demonstrate the absence of any genuine issue of fact as to a determinative issue, and only then is the non-movant required to come forward with contrary evidence." 644 N.E.2d at 123.

this case, arguing that the farm corporation at issue here is analogous to the corporation at issue in *Cressy*. As such, Maul maintains that the trial court should have compelled the shareholders to conduct themselves as equal partners, as this court recommended in *Cressy*.[2]

Van Keppel argues that the trial court correctly distinguished the *Cressy* decision from this case. According to Van Keppel, the duty to maintain equal ownership exists only when there is direct evidence that the shareholders intended to be equal partners in the business venture. Van Keppel contends that the designated material evinces no such intent among the shareholders in the farm corporation.

■■■ Our courts have often stated that shareholders in close corporations have fiduciary duties to one another.[3] *See Melrose v. Capitol City Motor Lodge, Inc.*, 705 N.E.2d 985, 991 (Ind.1998). As scholars have pointed out, however, use of the term "fiduciary" is only the beginning of the analysis, for the term carries few specific rules to control shareholders' transactions. Victor Brudney, *Fiduciary Ideology in Transactions Affecting Corporate Control*, 65 MICH. L.REV. 259, 259 (1966) ("The actual restrictions on, or prescriptions for, the fiduciary's conduct in any particular context are to be found more in the reasons for characterizing him as a fiduciary in that context than in any rules or articulated proscriptions derived from the mere fact of such a characterization.").[4] Thus, it is not enough merely to rely on *Cressy* to establish a broad fiduciary duty requiring equal ownership. We must examine the facts of the *Cressy* case and the rationale for the decision to determine whether the duty applied in *Cressy* should be applied here.

In *Cressy*, two individuals formed a corporation to purchase an office building. The two agreed to be "fifty-fifty partners" in the corporation and became the majority shareholders. 177 Ind.App. at 226, 378 N.E.2d at 943. Relations between the two soured after one of the shareholders sold newly issued stock to his parents and the other purchased some stock from a minority shareholder. Both individuals sought to void the other's stock transactions. The trial court found that the two had intended to be equal partners and that equity should effect that intent. 177 Ind.App. at 227–28, 378 N.E.2d at 944. This court affirmed, writing,

> "[t]he evidence sustained the court's determination that Cressy and Russell intended equal ownership and control of the business. The 'partnership' expectation of equality of shareholdings carried with it the duty on the part of each principal to disclose to the other the availability of outstanding shares for sale and to afford the opportunity to share in the purchase of such stock."

177 Ind.App. at 229–30, 378 N.E.2d at 945.

■ In *Cressy*, this court recognized that individuals who form close corporations "often expect to act and to be treated as partners in their dealings among themselves." 177 Ind.App. at 229, 378 N.E.2d at 945. We then explained that "when this intention is manifest and no harm results to outsiders thereby, there appears little reason to frus-

---

2. In *Cressy*, the trial court ordered an amendment to the articles of incorporation to remedy the inequality between the shareholders. This court held that the trial court lacked power to enforce such a remedy and recommended instead that the trial court either order the shareholders to vote as equal partners or order the sale of additional shares to balance the shareholding. 177 Ind.App. at 230, 378 N.E.2d at 946.

3. A close corporation is "one that typically has relatively few shareholders and whose shares are not generally traded in the securities market." *Melrose v. Capitol City Motor Lodge, Inc.*, 705 N.E.2d 985, 990 (Ind.1998) (citing *Barth v. Barth*, 659 N.E.2d 559, 561 n. 5 (Ind.1995)).

4. In Professor Brudney's view, judges should police shareholders in close corporations to prevent any single shareholder from purchasing a controlling interest without the other shareholders' consent. 259 MICH. L.REV. at 291. Although cited in *Cressy*, Professor Brudney's view is much broader than our holding there. We note that the law provides ample methods for shareholders to maintain equal ownership should they so desire including buy-sell agreements, stock transfer restrictions, and the like. Where the shareholders in a close corporation have not entered into such contracts, courts should be reluctant to impose contractual obligations upon them.

trate the parties' actual intent by strict adherence to the traditional norms of corporate law." *Id.* In other words, a court will not impose the strictures of corporate law upon individuals who have agreed to conduct themselves as equal partners.

 Integral to the *Cressy* rationale is an agreement or meeting of the minds among shareholders. The court indicated that absent evidence of such an agreement there is no justification for judicial interference into standard corporate affairs. 177 Ind.App. at 228, 378 N.E.2d at 945, n. 6. Indeed, one of the central purposes of the body of corporate law is to provide shareholders a standard framework for conducting corporate affairs. Any departure from the standard framework could thwart shareholders' expectations concerning corporate governance and as such disrupt their ability to conduct business. Accordingly, a departure from general corporate law is warranted only when (1) the shareholders agreed to bind themselves to partner-like conduct or (2) each shareholder intended to treat the others as equal partners. One shareholder's unilateral expectation of equal ownership is insufficient to bind all shareholders to that expectation.

 Here, the designated material establishes that there was no such agreement or intent. The material includes corporate documents, Maul's affidavit, excerpts from her deposition, and excerpts from Van Keppel's deposition. Although Maul states in her affidavit that her mother gave and bequeathed equal shares to each daughter, those statements are not probative of an agreement among the shareholders. The statements may demonstrate the mother's intent that the daughters forever maintain equal ownership of the farm corporation, but the mother's intent was not binding upon the daughters. Similarly, the corporate resolutions do not evince any agreement concerning corporate ownership. The resolutions state: "I. There should be three shareholders [out of the four] present when voting on any major

decision. II. All four shareholders should be consulted on any expenditure of $1,000 or more. III. Upon the death of one of the founding shareholders, her shares will be divided equally among her children." *Record* at 108.[5] The precatory language in the first two resolutions weakens their import; in any event, the two resolutions contain no indication that the sisters had agreed to maintain balanced corporate ownership. The third resolution merely maintains the ownership ratios that exist at the death of any sister; the resolution does not require that ownership remain equal among the sisters.

Nor does the deposition testimony Maul proffered mandate a different conclusion. Nearly all of the testimony is directed either to the timing of Van Keppel's offers to purchase her sisters' shares or to Van Keppel's disclosure of her interest in purchasing the shares. None of the testimony suggests that Van Keppel and Maul or the other sisters ever agreed to hold shares equally. *Record* at 116–152. To the contrary, Van Keppel testified that she did not think she had any obligation to inform Maul that the other two sisters' shares were available for purchase. *Record* at 151–52.

Further, Maul herself testified that she and her mother never discussed whether the sisters' shares could be transferred. *Record* at 183. Maul's testimony also indicates that she had no ongoing agreement with anyone to maintain equal ownership:

"Q. So as far as you're concerned, at the time you inherited these [shares] or they were gifted to you, let me say, you could have sold them if you wanted, isn't that right?

A. Well, I never really thought about it ."

*Record* at 183.

The evidence concerning shareholder agreements—or, more accurately, the lack of such agreements—is best summarized by Maul's deposition testimony:

---

5. The resolution concerning distribution of a sister's shares after death contained provisions concerning classes of stock. *Record* at 108. The shareholders later modified the resolution. *Rec-*

*ord* at 110. Neither the original resolution nor the modification implies any agreement concerning equal share ownership among the sisters.

"Q. You never had a contract with your mother concerning these shares, isn't that right .

A. That's right.

Q. And you never had a contract with any of your sisters regarding these shares, isn't that right?

A. That's right.

Q. And there isn't any written restriction on the transfer of these shares by any of the four of you sisters, isn't that right?

A. Not that I know of.

Q. And the four of you sisters never had any type of a partnership agreement, did you?

A. No."

*Record* at 186.

This testimony conclusively establishes that there was no agreement between the shareholders/sisters to maintain equal ownership, to be treated as partners, or to offer each other rights of first refusal on available shares. Further, there is no evidence of a meeting of the minds or of mutual intent to maintain equal ownership. Absent such evidence, the court cannot impose a duty upon the shareholders/sisters to maintain equal ownership or to offer each other rights of first refusal. The trial judge did not err in granting summary judgment in favor of Van Keppel and against Maul.

·Affirmed.

GARRARD, J., and NAJAM, J., concur.