**INDIANA HEALTH CENTERS, INC., Appellant–Plaintiff,**

v.

**CARDINAL HEALTH SYSTEMS, INC., Appellee–Defendant.**

No. 27A02–0111–CV–800.

Court of Appeals of Indiana.

Sept. 13, 2002.

Thomas R. Ruge, Todd A. Richardson, Brian A. Statz, Lewis & Kappes, P.C., Indianapolis, IN, Attorneys for Appellant.

Scott E. Shockley, Michelle L. Cooper, Defur Voran Hanley Radcliff & Reed, LLP, Muncie, IN, Attorneys for Appellee.

## OPINION

FRIEDLANDER, Judge.

Indiana Health Centers, Inc., (IHC) appeals the trial court's grant of summary judgment in favor of Cardinal Health System, Inc., (Cardinal) on IHC's claim for tortious interference with an employment contract between IHC and Dr. Paul Wolfe. IHC presents the following restated and consolidated issues for our review:

1. Did the trial court err in granting summary judgment in favor of Cardinal?

2. Did the trial court abuse its discretion in denying IHC's motion to compel the production of an opinion letter written by Cardinal's counsel?

We affirm.

Dr. Wolfe was employed full-time as a pediatric doctor for IHC in its Marion, Indiana clinic. Pursuant to a written Physician Employment Agreement (Agreement), Dr. Wolfe was to be employed by IHC from August 1, 1996 through July 31, 1999. The Agreement also contained a 180–day notice-of-termination clause [1] and a two-year non-compete clause.[2]

Soon after commencement of the Agreement, Dr. Wolfe started to become dissatisfied with certain aspects of his employment, most notably compensation. On September 25, 1996, Dr. Wolfe sent correspondence to Steve Stone, the clinical di-

---

1. The notice of termination clause provided: Physician may terminate this Agreement at any time upon one hundred eighty (180) days prior written notice to the Medical Director and President.... Any notice to terminate shall specify the date of termination. In the event Physician terminates this Agreement as described in this Subparagraph G prior to the end of the term of this Agreement, any termination prior to the end of the contracted period of time will result in the physician paying IHC 20% of the current annual salary. This is not to be construed as a penalty to the Physician, but reasonable compensation to IHC to cover the costs associated with recruitment of another physician.

*Appellant's Appendix* at 59.

2. This clause provides:

Upon termination of this Agreement, the Physician agrees that, for a period of two (2) years, he will not establish a practice or maintain an office for patient care within thirty (30) miles of any clinic site at which she [sic] worked while in the employ of IHC. Release from the requirements of this non-compete clause requires the prior written permission from the IHC President or Board of Directors.... This non-compete clause shall be in force for two (2) years from the date of termination.

*Appellant's Appendix* at 60.

rector of the Marion clinic, noting his inpatient hours and requesting 25% of all hospital billings.[3] · Dr. Wolfe revised his reimbursement request to Stone in correspondence dated December 16, 1996. The letter provided in part:

> This is the second letter of request for reimbursement of time/work performed over-and-above clinic hours. As you are aware, my contract clearly states that further reimbursement would be given when 'in hospital' hours exceeded 20 hours a week. The contractual 20+ hours was completed in the third week of September 1996. As of this date, nothing has been done on the part of IHC to reimburse me for the additional hours that I have been working.
>
> In my first letter (sent shortly after exceeding 20 hours/week), I requested 25% of hospital billing. In the ensuing three months, of no activity on the part of IHC to address reimbursement, I have been able to gather additional hard data to support my reimbursement....
>
> The additional time that I work has: 1) been over-and [sic] above clinic hours (ie. [sic] overtime), 2) taken away from my time with family and free time, 3) limited me of days off (have not been able to leave Marion secondary to large hospital practice), and 4) added additional stress to my life (sick patients—some of which have required ICU and Neonatal ICU services). Because of the additional work load and the reasons just described, I am now requesting 50% of billings (not collections) for inpatient services provided.
>
> \* \* \*
>
> In my many discussions with you (almost weekly), I was told that a deadline should be set. I have requested a dead-

line of Dec. 15 (3 months after the contractual requirements were met). This date is now upon us.

*Appellant's Appendix* at 69. Dr. Wolfe then proceeded to specifically list eight reimbursement requirements that he had established.

IHC did not officially respond to Dr. Wolfe's requests until May 13, 1997. On that date, Dr. James Whitfield, medical director of IHC, denied Dr. Wolfe's request, stating that the pediatric practice had not generated twenty hours of hospital care per week on a consistent basis. Dr. Whitfield then noted that IHC was continuing to work on an incentive program for all its physicians with a target completion date of July or August.

Dr. Wolfe sent a memo to Dr. Whitfield on July 17, 1997 requesting an opportunity to meet regarding unresolved contractual problems. The memo provided in part:

> Recently I have discussed issues regarding reimbursement and other contractual problems with a contract lawyer. At this point, we are trying to sort out what my legal options are. I am still interested in determining what IHC can do for me. You mentioned in the past that my current contract had some poorly written (ie. [sic] vague) parts *and* that you would be willing to offer me a new contract. I would like to work on contract negotiations as soon as possible, so that they may be affective [sic] by August 1 (contract anniversary date). If IHC is committed to keeping me at the Marion site, certain areas need to be resolved.
>
> \* \* \*
>
> Please let me know how soon we can meet and discuss my future with IHC.

*Appellee's Appendix* at 2 (emphasis in original):

> IHC agrees to investigate various reimbursement arrangements for extensive hospital rounds." *Appellant's Appendix* at 57.

---

**3.** Dr. Wolfe's demand was based on his interpretation of the following provision in the Agreement: "If, and when, routine hospital rounds exceed twenty (20) hours per week,

On July 28, 1997, Dr. Wolfe again sent correspondence to Dr. Whitfield, detailing his concerns prior to an upcoming meeting with Dr. Whitfield and then stating:

I have now worked 1 year with IHC and I am frustrated to the point that a change is required.

The time has come for me to make major life changes. My family has suffered significantly over the past year. I have worked an excessive number of hours for IHC without any support (financial or otherwise). It has also been very stressful in appealing to IHC. I started this process 10 months ago and started meeting with you 7 months ago. I was "led along" for 5 months (January thru May), that there would be accommodations made for me. To date—I have not received anything.

It is time for IHC to step up and make things right. This is what I am requesting:

1. remuneration to [sic] inpatient services

2. a new contract
   a. one year in length
   b. salary increase (>$120000)
   c. no noncompete clause
   d. guarantee of no changes in insurance coverage
   e. Guarantee of usual vacation (4 weeks), personal time, and CME time and monies (5 days and $1500).
   f. provision guaranteeing appropriate inpatient reimbursement.

After six months to 1 year, we can again meet and discuss renewal of the contract at that time. I have proved myself to IHC over the last 12 months. As stated in the last memo, "I am still interested in determining what IHC can do for me." I will not be working for the duration of my current contract—given the current conditions. If no agreement can be reached between you and myself, I will pursue various termination options including legal recourse.

I don [sic] not believe happiness is an unreasonable goal.

I look forward to a meeting with you in the near future.

*Appellee's Appendix* at 3–4.

Dr. Wolfe again wrote Dr. Whitfield on August 4, 1997:

After receiving your fax on July 30 and talking with you on the phone (same date), I felt it necessary to reiterate certain requests in writing. It is not worth your or my time to "rehash" certain areas. Over the last 12 months I have come to the realization that, with the current practices of IHC (particularly toward physicians), I have NO future with IHC. I must start placing more and more emphasis on my family, marriage, and personal happiness and satisfaction. I therefore have resolved to myself that, at this time, I will not be working with IHC more than one more year. When I signed with IHC—I was excited about the opportunity to work in this setting. In fact, if you refer to my contract, I had them add a clause to extend the duration after the second year if I so chose.

I have worked under difficult circumstances over that [sic] last year without any support from IHC. I have discussed working environments with other IHC physicians—and as the numbers show— I have out performed them in many areas, particularly performing inpatient services. There is little more that I feel I need to prove to IHC. As I look over the past year and also toward my future, IHC has done little to make me even consider future employment with them. I think it's evident that the treatment of physicians by this company is sub-par— with 4 resigning within the last 2 months.

Other "Problems" as listed in previous memos are of little importance this long after the inciting events. I would hope that our meeting on August 6 focuses on what IHC is going to do to retain me as a physician for another year, not on petty issues. The time to act is now. I will not put my family or myself through another year given the current situation. Again, I will reiterate, that if we can agree on a new contract of one year in length, we can anticipate reevaluation and possible contract extensions 6–12 months from now.

\* \* \*

*Appellee's Appendix* at 5.

On August 6, 1997, Dr. Whitfield wrote Dr. Wolfe in an attempt to clarify his position prior to their meeting. He explained that he believed Dr. Wolfe's contract to be reasonable and understandable. He further reminded Dr. Wolfe that IHC was in the process of developing an incentive program that would eliminate disputes between hospital verses outpatient care compensation. He admitted that the process had taken longer than anticipated to complete, but implied that Dr. Wolfe's current contract would not be altered until the incentive program was in place. He concluded:

IHC is not perfect; but having been in practice, both as owner and now employee, I can better understand the "mistake." You have given me a list of those mistakes. They could have been handled better.... I apologize for them,

but I cannot undo them and certainly do appreciate your bringing them to my attention. I have taken measures to assure that they do not reoccur.

In regard to your letter of August 4th, (including your decision not to continue with IHC), I receive with much regret. I hope that your decision is reversible. However, I personally would not want you to continue working in an environment that is disrupting to you, your marriage or family.

IHC and I personally appreciate your professional skills and devotion to patients. I hope that the economic issue can be resolved with the incentive based contract which continues to be developed.

\* \* \*

*Appellee's Appendix* at 6–7. Following the August 6 meeting, Dr. Whitfield wrote Dr. Wolfe on August 12, 1997. He expressed that the incentive program had not been put on hold and that it had a target implementation date of October 1.[4] He noted that this would be a voluntary addendum to each physician's contract and that generally other items of the contract would not be changed.

During this same period of time, Dr. Wolfe had been in contact with the National Health Service Corps (NHSC), a federal agency that provided him scholarship money for medical school in exchange for his agreeing to work for a certain period of time in a designated underserved area, such as Marion.[5] In a detailed letter writ-

---

**4.** The facts most favorable to IHC reveal that the incentive program was implemented on October 1, 1997, and Dr. Wolfe attended its "kick-off" conference.

**5.** The NHSC is described in the record:
NHSC is a federal agency that provides scholarships and loans to medical students in exchange for the students' agreement to provide medical services in designated ar-

eas. When the medical students complete a primary care residency, they can satisfy their obligation to NHSC by treating medically underserved groups or working in a medically underserved area for a specific period of time. NHSC determines which groups are medically underserved groups and which areas are medically underserved communities.
*Appellant's Appendix* at 48–49.

ten in July 1997 to Clarinda Valentine, Dr. Wolfe notified NHSC of numerous problems at his placement site. Dr. Wolfe stated, "I have been extremely disappointed with the dishonesty and corruption that I have experienced working for IHC." *Appellee's Appendix* at 11. He then noted that he had contacted an attorney and was considering possible methods of terminating his contract with IHC.

The day following a conversation with Judy Jensen, another representative of NHSC, Dr. Wolfe sent a letter to her on August 12. Dr. Wolfe enclosed the earlier letter to Valentine and expanded somewhat on his concerns. He noted his recent meeting with Dr. Whitfield and stated, "I also made it clear that I had considered resigning now, and if not now—that I would only be working with IHC for one more year (this only if IHC would make an attempt to 'make things right')." *Appellee's Appendix* at 9.

Thereafter, on August 21, 1997, Dr. Wolfe called NHSC and indicated that he wished to pursue a private practice option (PPO) in the Marion area. Jensen forwarded PPO application materials to Dr. Wolfe on August 26. Up to this point, Dr. Wolfe had never met any representative of Cardinal or had any discussions with anyone from Cardinal. In late August, however, Dr. Jim Orrell, a personal friend, asked Dr. Wolfe if he had any interest in working with him at Marion Family Practice, a subsidiary of Cardinal, when he was done with his NHSC obligation. In late September, Dr. Orrell approached Dr. Wolfe again about his interest in joining him at Marion Family Practice. Dr. Orrell or Dr. Westfall, another physician friend of Dr. Wolfe's, then contacted Robert Gildersleeve, executive vice president of Cardinal

and president of Primary Care Delivery Corporation,[6] and explained that they had a friend who was a pediatrician in Marion and who was very dissatisfied with his employment. They invited Gildersleeve to join them at a lunch with Dr. Wolfe, and on September 22, 1997, Dr. Orrell and Dr. Westfall introduced Dr. Wolfe to Gildersleeve. At this lunch, Dr. Wolfe expressed his discontentment with IHC and his desire to leave IHC. Dr. Wolfe noted that he had contacted a lawyer to explore termination options. Gildersleeve informed Dr. Wolfe that if he could resolve his contractual status with IHC, he would then be interested in discussing possible future employment with Dr. Wolfe.

By letter dated September 23, 1997, Gildersleeve requested a copy of Dr. Wolfe's employment contract so that Cardinal's attorneys could review the non-compete provision. Gildersleeve also thanked Dr. Wolfe for his interest and assured him that there was plenty of time to resolve his contractual issues and develop a mutual agreement with Cardinal. After forwarding a copy of the Agreement, Dr. Wolfe never heard anything in reply from Cardinal's attorneys regarding the non-compete provision.

During October and November, Gildersleeve had a few telephone conversations with Dr. Wolfe regarding his employment at IHC. Dr. Wolfe informed Gildersleeve that Dr. Wolfe's attorney had advised him he could leave his employment because IHC was in breach of the Agreement and that he had made a decision to do so. At each instance, Gildersleeve reminded Dr. Wolfe that he would have to resolve the issue of his IHC contract before Cardinal

---

**6.** Primary Care Delivery Corporation (PCDC) was formed in 1995 as a subsidiary of Cardinal to acquire primary care physician practices and to employ physicians and support staff to provide primary care as part of Cardinal's integrated health care delivery system. For simplicity, we will refer to PCDC as Cardinal whenever practicable.

would discuss any details of employment with him.

On November 24, 1997, Dr. Wolfe sent a resignation letter to Dr. Whitfield, indicating that on the advice of counsel he was resigning from IHC as of December 31, 1997. Dr. Wolfe informed Gildersleeve of his resignation and actively pursued an employment arrangement with Cardinal. At this time, Gildersleeve made Dr. Wolfe an offer of employment, which Dr. Wolfe accepted after some brief negotiation. Dr. Wolfe's employment agreement with PCDC was executed on December 2, 1997. This agreement provided that Dr. Wolfe would begin providing services in Marion on January 1, 1998.

Upon learning of Dr. Wolfe's plans, IHC immediately notified Cardinal that Dr. Wolfe was still under contract with IHC. While the Marion Family Practice administrator initially informed IHC that Marion Family Practice had not hired Dr. Wolfe, Gildersleeve quickly advised IHC that Cardinal had hired Dr. Wolfe. Gildersleeve further noted that he negotiated with Dr. Wolfe on the basis of Dr. Wolfe's belief that his contract with IHC was void. Representatives of IHC, Lynn Clothier and Timothy Gee, met with Gildersleeve in the beginning of January to explain that Dr. Wolfe still had a legally binding contract with IHC. Gildersleeve remarked that he did not want to be a party to such a breach and that he would advise Dr. Wolfe to return to employment at IHC. In this meeting, Clothier and Gee stated that IHC would accept Dr. Wolfe being assigned by Cardinal to work part-time at IHC until a replacement could be found. Gildersleeve was helpful in trying to negotiate a resolution and had no objection to such an arrangement. He remained neutral as Dr. Wolfe and IHC entered into negotiations. These negotiations failed around the end of January due to what

IHC felt were unreasonable demands by Dr. Wolfe.

Thereafter, in February 1998, IHC commenced an arbitration proceeding against Dr. Wolfe for breach of contract. The arbitration hearing was held on September 16 and 17, 1998. At the hearing, IHC claimed that Dr. Wolfe breached the Agreement by failing to give adequate notice of termination and by disregarding the terms of the non-compete clause. Dr. Wolfe on the other hand contended that IHC breached the Agreement by not compensating him for hospital rounds in excess of twenty hours and also claimed that IHC illegally interfered with his right to obtain other employment.

Following the hearing, the arbitrator concluded that IHC did not breach the Agreement, finding that on average Dr. Wolfe did not exceed twenty hours per week in hospital rounds and that IHC did, in good faith, investigate providing additional compensation to Dr. Wolfe. The arbitrator further determined that Dr. Wolfe breached the notice provision and awarded $19,200 to IHC pursuant to the liquidated damages clause contained in the Agreement's notice provision. With regard to the non-compete clause, the arbitrator found the terms "clear and enforceable" but concluded, "the damages resulting from this breach are less than clear." *Appellant's Appendix* at 41. The arbitrator explained:

> In this case, IHC has failed to demonstrate that it lost revenue due to Dr. Wolf's departure. Further, there is insufficient evidence as to the amount of damages, even assuming Wolf's departure caused the damages. . . . Despite a good faith effort to prove damages, there is insufficient evidence to support an award for damages. Further, the costs of recruiting another physician are considered in the 20% of earnings owed

by Wolfe for failing to give adequate termination notice.

*Appellant's Appendix* at 41–42.

On November 29, 1999, IHC commenced the instant action against Cardinal, asserting a claim of tortious interference with contract. Cardinal filed for summary judgment on July 2, 2001. In its motion for summary judgment, Cardinal argued that no genuine issue existed with regard to the inducement and lack of justification elements. Cardinal further asserted that IHC was collaterally estopped from relitigating the issues of breach and damages based upon the arbitration decision. In support of its motion, Cardinal designated, among other evidence, the affidavit of Gildersleeve. Paragraph 7 of the affidavit provided:

> On September 23, 1997 I sent a letter to Dr. Wolfe, a copy of which is attached as Exhibit WW. In this letter I invited Dr. Wolfe to send me a copy of his contract with IHC, which he did. I asked our attorneys to review the contract and sent it to them on October 3, 1997. Our attorneys provided me with their opinion about Dr. Wolfe's contractual status but we did not instruct them to take any action or have any contact with Dr. Wolfe or his lawyer.

*Appellant's Appendix* at 44. In addition to opposing summary judgment, IHC moved to compel production of the opinion letter from Cardinal's attorneys on October 15, 2001.

The trial court held a hearing on both pending motions on October 18. Soon thereafter, on October 30, the trial court denied the motion to compel, finding no waiver of confidentiality of attorney-client privilege. In the same order, the trial court also granted Cardinal's motion for summary judgment. IHC now appeals.

**1.**

■ IHC first argues that the trial court erred in granting summary judgment. It contends that a genuine issue of fact exists with regard to whether Cardinal intentionally induced Dr. Wolfe to breach the Agreement and whether there was an absence of justification for Cardinal's actions. IHC further argues that it was not collaterally estopped from litigating its damages.

■ Our standard of review is well settled:

> In an appeal involving summary judgment, the appealing party bears the burden of persuasion, and we assess the trial court's decision to ensure that the parties were not improperly denied their day in court. *Midwest Sec. Life Ins. Co. v. Stroup,* 730 N.E.2d 163, 165 (Ind. 2000). We analyze the issues, however, in the same way as a trial court would. *Carie v. PSI Energy, Inc.,* 715 N.E.2d 853, 855 (Ind.1999). A party seeking summary judgment must show "that there is no genuine issue as to any material fact and that the moving party is entitled to a judgment as a matter of law." Ind. Trial Rule 56(C). The movant must designate sufficient evidence to eliminate any genuine factual issues, and once the movant has done so, the burden shifts to the nonmovant to come forth with contrary evidence. *See Butler v. City of Peru,* 733 N.E.2d 912, 915 (Ind. 2000)[.] The court must accept as true those facts alleged by the nonmoving party, construe the evidence in favor of the non-movant, and resolve all doubts against the moving party. *Ind. Univ. Med. Ctr. v. Logan,* 728 N.E.2d 855, 858 (Ind.2000)[.]

*Shambaugh & Son, Inc. v. Carlisle,* 763 N.E.2d 459, 460–61 (Ind.2002) (some citations omitted). We further observe that "[w]hen the issue in a case involves intent, traditional doctrine counsels against granting summary judgment." *Maul v. Van Keppel,* 714 N.E.2d 707, 709 (Ind.Ct.App.

1999) (citing *Century Bldg. Partnership, L.P. v. SerVaas,* 697 N.E.2d 971, 973 (Ind. Ct.App.1998) ("summary judgment must be denied if the resolution thereof hinges upon a state of mind, credibility of witnesses, or weight of testimony")). When the material designated by the parties is conclusive, however, summary judgment may be appropriate even if the dispositive issue turns on an individual's intent. *Maul v. Van Keppel,* 714 N.E.2d 707.

■■ A claim for tortious interference with a contractual relationship is established by evidence of the following elements: (1) the existence of a valid and enforceable contract; (2) defendant's knowledge of the existence of the contract; (3) defendant's intentional inducement of breach of the contract; (4) the absence of justification; and (5) resulting damages. *Winkler v. V.G. Reed & Sons, Inc.,* 638 N.E.2d 1228 (Ind.1994); *Levee v. Beeching,* 729 N.E.2d 215 (Ind.Ct.App.2000). On summary judgment, Cardinal argued that as a matter of law it did not induce Dr. Wolfe to breach the Agreement and that as a matter of law it did not act without justification. Cardinal further claimed that IHC should be collaterally estopped from relitigating its theory of damages.

The undisputed evidence reveals that as a matter of law Cardinal did not intentionally induce Dr. Wolfe to breach his contract with IHC. As the facts detailed above show, serious problems developed in the employment relationship between Dr. Wolfe and IHC well before Cardinal entered the picture. Dr. Wolfe's frustration intensified during the period between September 1996 and August 1997. In letters written to IHC's medical director in July and August, Dr. Wolfe informed IHC of the strong possibility that he would be leaving his employment before his contract expired. Lynn Clothier, IHC's president during the relevant time, testified concerning Dr. Wolfe's July 28 letter to Dr. Whitfield and the demands contained therein:

Dr. Whitfield and I had a lengthy discussion about the fact that these things were not possible within our policies, so there was nothing that we could do as far as we were concerned to help Dr. Wolfe out with these demands.

*Appellee's Appendix* at 69. Clothier further testified that following this letter she would have advised Dr. Whitfield to begin recruiting Dr. Wolfe's replacement. Similarly, with regard to the August 4 letter from Dr. Wolfe to Dr. Whitfield, Clothier agreed that this reaffirmed Dr. Wolfe's intent to leave IHC before the end of his contract term. She then stated, "Again, I would have advised Dr. Whitfield to start looking for his replacement." *Appellee's Appendix* at 70.

Further evidence of Dr. Wolfe's intention to leave IHC is that he began consulting an attorney in June or July to review his contractual status with IHC. He also notified NHSC during the summer of his problems at IHC. He informed NHSC that he had contacted a contract lawyer and that he was considering legal recourse and possible methods of terminating the Agreement. Thereafter, on August 21, Dr. Wolfe called NHSC and indicated that he wished to pursue a private practice option in the Marion area. NHSC forwarded application materials to him on August 26.

The above events, which clearly document Dr. Wolfe's intent to leave IHC early, transpired more than a month before Dr. Wolfe ever spoke with Gildersleeve. Moreover, the undisputed evidence reveals that Gildersleeve did not seek out Dr. Wolfe or encourage him to breach his contract with IHC. Instead, he repeatedly told Dr. Wolfe that he would have to solve his contract situation with IHC before the two could discuss future employment options

and assured Dr. Wolfe that there was no rush. Moreover, Clothier testified that after Dr. Wolfe's departure Gildersleeve was cooperative with the idea of having Dr. Wolfe serve on a part-time basis at IHC's Marion clinic while IHC looked for a replacement. It was purely Dr. Wolfe's apparently unreasonable demands that thwarted such a resolution to the situation.

In the end, we are compelled to conclude that this is simply not an appropriate case to apply the tort of tortious interference with contract. Cardinal did not intervene and intentionally induce Dr. Wolfe to prematurely terminate his employment contract with IHC, as Dr. Wolfe had already resolved to take such action. Further, the mere fact that Cardinal hired Dr. Wolfe with knowledge that his employment would violate the Agreement's non-compete clause does not amount to inducement of breach. *McLinden v. Coco*, 765 N.E.2d 606, 617 (Ind.Ct.App.2002) ("one does not induce a second party to breach a contract with a third party when one merely enters into an agreement with the second party with knowledge that the second party is unable to perform both contracts"). Although IHC's contractual interests under the Agreement were certainly entitled to protection, IHC had already been afforded the benefit of such protection through contract law. The trial court did not err in granting summary judgment and thus denying additional protection under tort law.[7]

### 2.

We briefly address the denial of IHC's motion to compel. In its motion to compel, IHC argued that Cardinal had opened the door to discovery of the opinion letter by presenting evidence, contained in Gildersleeve's affidavit, that Cardinal attorneys had reviewed the Agreement and provided their opinion of Dr. Wolfe's contractual status to Gildersleeve. IHC further asserted in the motion that Cardinal had attempted to use this evidence to establish a justification for its actions, while at the same time refusing to produce the letter or divulge its contents.

We initially observe that nothing in the record leads us to believe that Cardinal sought to use this evidence to establish a justification for its actions. Rather, Gildersleeve testified in his deposition that Cardinal did not intend to use the fact that Cardinal attorneys had reviewed the Agreement in defense of this case. Further, the relevant portion of Gildersleeve's affidavit appears to be part of Gildersleeve's effort to document and explain the extent of his contacts with Dr. Wolfe. Moreover, even assuming that Cardinal provided this evidence for the purpose of establishing a justification for its actions, we observe that this issue is moot in light of our determination that summary judgment was properly granted based on the intentional inducement element.

Judgment affirmed.

BROOK, C.J., and SHARPNACK, J., concur.

---

7. Because we have determined that Cardinal did not intentionally induce the breach as a matter of law, we need not reach the issues of lack of justification and collateral estoppel.